In the Matter of INTERNATIONAL RAILWAY COMPANY, Petitioner, against JOHN P. BOLAND and Others, as the Members of and as Constituting The New York State Labor Relations Board, and NEW YORK STATE LABOR RELATIONS BOARD, Respondents.

In the Matter of NEW YORK STATE LABOR RELATIONS BOARD, Petitioner, against INTERNATIONAL RAILWAY COMPANY, Respondent.

In the Matter of FRONTIER BUS AND STREET CAR EMPLOYEES' ASSOCIATION, Petitioner, against NEW YORK STATE LABOR RELATIONS BOARD and Others, Respondents.

Supreme Court, Erie County, January 3, 1939.

*Killeen & Sweeney*, for the International Railway Company.

*Peter A. Schultz*, for the Frontier Bus and Street Car Employees' Association.

*Burton A. Zorn* and *Cyril J. Kavanagh*, for the members of and the New York State Labor Relations Board.

*Daniel S. Shortal*, for the Transport Workers Union of America.

HINKLEY, J. This is a judicial review of a decision of the New York State Labor Relations Board, which found that the Frontier

Bus and Street Car Employees' Association, composed of employees of the International Railway Company, was a company union, and ordered that the association be disbanded.

The matter comes before the court upon an order to show cause by New York State Labor Relations Board to enforce the order of the Board, acting under authority conferred by section 706 of the Labor Law, under the caption " New York State Labor Relations Act." A cross-order to show cause was made by the International Railway Company, under section 707 of the Labor Law, to vacate and set aside the findings and order of the Board. An order to show cause, similar to the one last above mentioned, was granted to the Frontier Bus and Street Car Employees' Association, hereinafter called the Frontier Union.

The judicial review of a decision of a labor relations board covers a relatively new field not yet thoroughly cultivated by judicial precedent. It is manifestly distinctly different from an appellate review of judicial trials.

The one fundamental and all-inclusive reason for the creation of a labor relations board, be it State or National, is to encourage and protect collective bargaining. " Employees shall have the right of self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in concerted activities, for the purpose of collective bargaining or other mutual aid or protection, free from interference, restraint, or coercion of employers." (Labor Law, § 703.) The right of collective bargaining for all employees, through exclusive representatives chosen by majority vote of the employees, affords to such employees a maximum of protection. The right is a protecting shield for the employees, not only against unfair labor practices of dominating employers, but also against those who seek to exploit employees in the interest of affiliated unions., independent unions, company unions, or non-union employees.

Great aggregations of capital have produced mass employment. The absolute domination exercised by a single individual employer over his one employee could not, in the best interests of society, continue when the individual employer became a corporation and the one worker multiplied a hundred or a thousand-fold.

Undoubtedly, as expressed in the findings and policy of the State Labor Relations Act, the statute itself was born of the common concept that capital was capable of and had dealt unjustly with labor. Employer domination of mass labor has been a serious menace to society and must bear its full share of the responsibility for the present widespread ebb of industrial activity and the consequent flow of unemployment. As a result of our present hysterical

search for a panacea for all evils, great changes are taking place, not only in our social, economic and governmental structure, but in our law-enforcement agencies. This is true not only in multiplicity of bureaus and commissions but in the recognition by judicial decision of a unilateral method of bureaucratic prosecution. Perhaps the most striking change is the creation of labor relations boards, seeking as a goal an ideal system of enforced collective bargaining. Conceived as an instrument to compel the employer to be and remain upon an equal footing with the employee, the practice, procedure and decisions of a labor relations board are unlike those of a trial in court presided over by an impartial judge. Upon receipt of a complaint the labor relations board conducts an investigation. If so advised it appoints a non-member as an examiner. The board then itself prosecutes the charge and seeks to convince its own examiner that the individual, copartnership or corporation charged with the violation of a statute has been guilty of unfair labor practices. If the board is successful in convincing itself, through its examiner, that the individual, copartnership or corporation has violated the statute, the board renders its decision and issues drastic punitive orders of various kinds. Thus the board is complainant, investigator, prosecutor, judge and jury. However, by a provision of the statute, the board cannot act as sheriff and enforce its own orders, but must apply to the court, as in this instance.

The basic purpose of this method of enforced collective bargaining directed against the employer is reflected also in the scheme and conduct of a judicial review. If this were an appeal from the decision of a judicial tribunal, then the charge would have to be proven by a fair preponderance of the evidence, and, like any other fact, it would have to be established. (*People ex rel. Gilson* v. *Gibbons*, 231 N. Y. 171, at p. 177.) The application of that principle of law would require, without further argument, a reversal of the decision of the board in this case. However, the abstract duty of the court in a judicial review of the decision in this proceeding by the New York State Labor Relations Board differs materially from a review or appeal from a decision of a lower court. That duty has been concisely stated in a recent decision. " The findings of the Board as to the facts, if supported by evidence, shall be conclusive." (Identical language of National [Labor Relations Act, U. S. Code, tit. 29, § 160, subd. (e)] and New York State Labor Relations Acts [Labor Law, § 707, subd. 2].) " Means supported by substantial evidence. Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."

*(Consolidated Edison Company* v. *National Labor Relations Board,* 305 U. S. 197, Sup. Ct., Oct. term, 1938.) Substantial evidence must mean evidence of substance which establishes facts and from which reasonable inferences may be drawn. It does not connote suspicion, imaginative suggestions, surmises or conjectures. Reasonable inferences are not finespun arguments but are inferences based upon reason or that a reasonable man would accept.

This judicial review narrows down to the determination of whether there is substantial evidence to sustain the findings of the board that the International Railway Company violated subdivision 3 of section 704 of the Labor Law to the extent that the International Railway Company fabricated or maintained the Frontier Union as a company union, as defined in subdivision 6 of section 701 of the Labor Law. Collateral to that is the question whether the International Railway Company violated subdivision 10 of section 704 of the Labor Law.

Subdivisions 3 and 10 of section 704, section 703 and subdivision 6 of section 701 of the Labor Law are as follows:

" 704. * * * 3. To dominate or interfere with the formation, existence, or administration of any employee organization or association, agency or plan which exists in whole or in part for the purpose of dealing with employers concerning terms or conditions of employment, labor disputes or grievances, or to contribute financial or other support to any such organization, by any means, including but not limited to the following: (a) by participating or assisting in, supervising, controlling or dominating (1) the initiation or creation of any such employee organization or association, agency or plan, or (2) the meetings, management, operation, elections, formulation or amendment of constitution, rules or policies, of any such employee organization or association, agency or plan; (b) by urging the employees to join any such employee organization or association, agency or plan for the purpose of encouraging membership in the same; (c) by compensating any employee or individual for services performed in behalf of any such employee organization or association, agency or plan, or by donating free services, equipment, materials, office or meeting space or anything else of value for the use of any such employee organization or association, agency or plan; provided that, an employer shall not be prohibited from permitting employees to confer with him during working hours without loss of time or pay."

"10. To do any acts, other than those already enumerated in this section, which interfere with, restrain or coerce employees in the exercise of the rights guaranteed by section seven hundred three."

"703. Rights of employees. Employees shall have the right of self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in concerted activities, for the purpose of collective bargaining or other mutual aid or protection, free from interference, restraint, or coercion of employers."

"701. * * * 6. The term 'company union' means any committee, employee representation plan or association of employees which exists for the purpose, in whole or in part, of dealing with employers concerning grievances or terms and conditions of employment, which the employer has initiated or created or whose initiation or creation he has suggested, participated in or in the formulation of whose governing rules or policies or the conducting of whose management, operations or elections the employer participates in or supervises or which the employer maintains, finances, controls, dominates, or assists in maintaining or financing, whether by compensating anyone for services performed in its behalf or by donating free services, equipment, materials, office or meeting space or anything else of value, or by any other means."

Careful study of the seventy-seven page decision of the board, the argument and brief of the board's counsel, reveals the following specific and only acts of the company upon which the board bases its decision that the company has been guilty of unfair labor practices, to wit, that the company exhibited to its employees interested in the formation of the Frontier Union the company's employment records, payrolls, and so forth; gave a leave of absence to an employee stenographer, an employee committeeman, and accountant to assist in the organization of its employees; gave free access to the company property to the business agent of the Frontier Union; confined the use of its bulletin boards to the duly accredited bargaining agent of the Frontier Union; and discharged one employee named Larkins because he had joined and assisted the Transport Workers Union Local No. 162.

Each and every one of these acts, save the last, is as equally consistent with innocence as with guilt. Larkins openly and knowingly violated one of the most important and salutary rules of the company. The Labor Board attempts to minimize his wrongdoing by the argument that that rule and other rules had been disregarded by other employees with impunity. Discipline must be maintained among employees of passenger transport companies, not only to conserve the finances of the company, but in the broader interest of safety to the traveling public.

There is a statement in the board's decision that in the transfer room of the company there was a table upon which there was a

box, that an employee sat behind the table, taking applications and initiation fees, and that this was in the range of vision of clerks behind cages who were under the immediate authority of the district manager. Surely this is too far a cry to charge that, by that act, the company participated in or assisted in the formation of the Frontier Union.

The board charges against the company the following omissions: Permitting organizers of the Frontier Union to solicit members on company property; failing to show its disapproval of the Frontier Union; failing to forbid those employees who were active under the former co-operative plan from activity in the Frontier Union; failing to control or disapprove the conduct of the business agent of the Frontier Union; failing to prevent overzealousness upon the part of the organizers of the Frontier Union; failing to prevent friction between the adherents of the two unions; failing to refuse to meet the accredited representatives of the Frontier Union, which was the duly constituted bargaining agency of the employees; failing to refuse all demands of the collective bargaining agency; failing to refuse to contract with the duly constituted bargaining agency; and failing to refuse to treat with the bargaining agency.

Certainly it must be conceded that had the company acted in the above instances as the board's decision suggests such acts would have been direct violations of the restrictions against unfair labor practices. The spirit and intent of the entire Labor Relations Act is to protect and benefit all employees and not to favor independent, affiliated or any other union or organization. In plain criticism of the company's failure to act contrary to definite provisions of the statute, the board has failed to grasp the true significance of the law. Its decision, irrespective of its effect upon the employer, would be most harmful to the best interests of the employees. " The maintenance of proper standards on the part of administrative agencies in the performance of their quasi-judicial functions is of the highest importance and in no way cripples or embarrasses the exercise of their appropriate authority. On the contrary, it is in their manifest interest. For, as we said at the outset, if these multiplying agencies deemed to be necessary in our complex society, are to serve the purposes for which they are created and endowed with vast powers, they must accredit themselves by acting in accordance with the cherished judicial tradition embodying the basic concepts of fair play." (*Morgan* v. *United States*, 304 U. S. —, at p. 22.) The fact that the Frontier Union, through its duly appointed attorneys, asks to be let alone is a true indication that the employees realize that, through the decision of the board, the shield designed for their protection has become a sword wielded against their best interests.

The board gives to the company a complete bill of health in so far as its expressed intention to abide by the statute is concerned.

The board, as a basis for its findings of employer domination, draws unfavorable inferences from the following circumstances, all of which are consistent with innocence: The original Mitten plan; its similarity in structure to the Frontier Union, particularly in its democratic method of election of representatives for collective bargaining and in its by-laws; the openly expressed regret of the employer that after sixteen years of peaceful negotiations the Mitten plan must be abandoned; the rapidity of the formation of the Frontier Union; the fact that those employees who were active under the old plan are still enjoying the confidence of their fellow employees; and the fact that that plan was abandoned and the Frontier Union formed without bitterness or rancor or the aid of a strike, which is the employee's most powerful, albeit his most expensive, weapon. From these innocent circumstances no reasonable person would inferentially arrive at the conclusion that the company had engaged in unfair labor practices.

The evidence as presented to the board by the examiner is not of that substantial nature required to prove that the Frontier Union is a company union, or that the company engaged in unfair labor practices.

Substantial evidence upon one proposition loses force in its relation to contrary, undisputed facts and circumstances. We are not here considering the demand of a bare majority but the openly expressed wish of approximately 1,407 out of 1,470 employees. From the character of their work these employees must be of average, if not more than ordinary, intelligence. Every reasoning man would infer from that that they were not mere puppets subject either to open or subtle domination. Although perhaps beside the point is the thought that in the background we must realize the effect upon the safety and convenience of the traveling public if, by governmental fiat, we deprive these employees of their chosen method of collective bargaining. Surely it is vital to understand that the whole scheme, structure and operation of the Labor Relations Act is to conserve the best interests of these and all other employees. Not one scintilla of evidence has been produced of any open declaration, word or act of the employer in any manner initiating, controlling or dominating the Frontier Union. On the contrary, the company has repeatedly assured its employees that the company would obey the spirit and letter of the statute. Counsel for the board has attacked the written communication of Dr. Mitten at the time of the dissolution of the Mitten co-operative plan. No more appropriate language could have been chosen to express the

writer's position; his regret at the abolition of the old system; his clear statement that it must end; his explanation of the principles of the new law; and his assurance that the company would bargain collectively under any plan the employees might choose. To assign to that letter a sinister double-meaning is to misinterpret the English language.

Counsel for the board earnestly argues that the subtle, insidious, hidden domination of an employer over the individual will of the employees is the most dangerous of all evils. This is true, and it is equally true that that type of domination is most difficult of proof. Yet without substantial evidence to support such a claim, the destruction of the free will of the employee by decision of the board is equally injurious to the employee and turns against him the very instrumentality designed for his benefit and his benefit alone.

The burden of this judicial review has been lightened by the carefully-worded decision of the board; the clear three-day argument of counsel, and the painstaking care with which the briefs and exhibits have been prepared and presented to the court.

From a careful study of all of the records and citations, the court has concluded that the order of the board should not be enforced but that the cross-motion of the Frontier Union and the International Railway Company to vacate and set aside the findings of the board should be granted.

Order may be entered in accordance with this opinion.